UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
TRIDENT INTERNATIONAL LIMITED, :
:
                *Plaintiff*, :
:
   *-against-* :
:   05 Civ. 3947 (PAC)
AMERICAN STEAMSHIP OWNERS :
MUTUAL PROTECTION AND :
INDEMNITY ASSOCIATION, INC., :   **OPINION & ORDER**
:
                *Defendant*. :
:
---------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiff Trident International Limited ("Trident") brings this action against Defendant American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club" or "the Club") for indemnity under a marine protection and indemnity ("P&I") contract issued by American Club to Imperial Majesty Cruise Line ("IMCL"), which named Trident as an additional insured.

    Trident is a corporation organized under Bahamian laws with its office and principal place of business in Nassau, Bahamas. Trident provided food and beverage services on board the Ocean Breeze, a passenger cruise ship, operated by IMCL. Trident's contract with IMCL, dated May 12, 2000, provided in relevant part:

> IMPERIAL [IMCL] as operator of the vessel shall secure from its insurance carrier Risk Insurance insuring Trident against all liability to its own employees or liability to third persons and all other risks normally covered under the terms and conditions of a standard Protection and Indemnity policy where said risks are

1

>applicable to TRIDENT, and to furnish TRIDENT a certificate evidencing said Protection and Indemnity Insurance to be in full force and effect and making TRIDENT as a co-insured under the coverage.

(Trident/IMCL Contract, Clause 10.)

IMCL in turn obtained insurance coverage from American Club, a non-profit assessable mutual marine protection association providing P&I insurance to its members at cost. Although American Club has its own Board of Directors, its day-to-day affairs are managed by the Shipowners Claims Bureau ("SCB"). Both American Club and SCB are located in New York City.

Trident sues American Club for $697,208.48 together with interest, representing expenses it incurred in the defense and settlement of three separate personal injury claims which Trident claims are covered by its P&I contract. The three claimants, Mark Taylor, Roberto Cartaya, and Jorge Rivera, were all food and beverage staff employees on board the Ocean Breeze. The claims of these employees, for which Trident seeks indemnification, are summarized as follows:

1. Taylor Claim, May 22, 2000—Taylor slipped and fell on a wet floor while loading supplies, injuring his left knee and lower back. Trident paid $302,757.75 in settlement and attorneys' fees for the claim.

2. Cartaya Claim, June 29, 2000—Cartaya sustained injuries while jumping from the Ocean Breeze to a tender. American Club paid Trident $194,856.03 of the $359,393.56 Trident paid on the claim, leaving an unpaid balance of $164,537.53.

3. Rivera Claim, March 7, 2001—Rivera slipped on a galley floor, sustaining injuries to his right knee and lower back. Trident paid $201,913.19 in settlement and attorneys' fees. American Club

2

                initially approved reimbursing Trident a total of $65,000, but subsequently reversed the decision.

Based on these claims, Trident seeks reimbursement in the total amount of $669,208.47.

    American Club maintains that it owes Trident nothing for these claims. The Club's insurance contracts are governed by its By-Laws and Rules ("the Rules"). As this Court has previously described, the American Club Rules require the following conditions precedent to coverage: that the insured provide to American Club "prompt notice" of "any happening;" that the insured avert or minimize any expense or liability associated with the incident or happening, and disclose to the Club all relevant and related information; and that the insured neither settle any claim nor admit liability without prior approval from the Club. (Dkt. 76, July 24, 2008 Order at 8, quoting from Rule 1, § 13 in JX-3.) American Club argues that Trident failed to comply with these requirements and was properly denied coverage for that failure.

    Both parties cross-moved for summary judgment. The Court denied their motions on July 24, 2008, finding that there were factual questions as to whether the communications sent from American Club to Trident were sufficiently specific and timely to disclaim coverage, and whether Trident complied with American Club's rules. On February 4, 2009, the Court found that, contrary to Trident's assertions, American Club did not waive its ability to deny coverage for the claims at issue, and could not otherwise be estopped from denying coverage, since "the members [] agreed that each will defend itself at its own cost and agreed to rules which allow the Club to deny coverage at any time." (Dkt. 84, February 4, 2009 Order at 3.)[1]

---

[1] This finding was based on the Club Rules, in particular, Rule 2, Section 17, which states:

> . . . the Member shall not be entitled to indemnity for expenses unless they were incurred with the approval in writing of the Association, or the Association shall be satisfied that such approval could not have been obtained under the circumstances without unreasonable delay, or that the expenses were reasonably and properly incurred; and provided further that any suggestion or approval of counsel, or any incurring of expenses in connection with liabilities not insured

On February 9 and 10 of 2009, a bench trial was held to determine whether Trident breached conditions precedent to coverage. The Court explicitly described the questions for trial in its February 4, 2009 Order as follows:

> The Court will review at trial the issue of whether Trident breached conditions precedent under a two-part analysis. First, was the Board's procedure fair? In other words, did Trident have fair notice and opportunity to present evidence to the Board, as well as a fair process of review? Second, was the Board's substantive decision to deny coverage incorrect?

(Dkt. 84 at 5.) The Court further described that, for both of these questions, the Plaintiff bears the burden of proof. *Id.*; *see Century 21, Inc. v. Diamond State Ins. Co.*, 2006 U.S. Dist. LEXIS 56733, at *7 (S.D.N.Y. Aug. 10, 2006).

The Court concludes that Trident has not shown, based on a preponderance of the evidence, that Trident lacked fair notice and an opportunity to present evidence to the Board, or that the Board's substantive decisions to deny coverage were incorrect. Accordingly, judgment is to be entered for American Club.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The facts and conclusions in the introduction to this opinion and the following discussion constitute the Court's findings of fact and conclusions of law. Four witnesses testified at the bench trial in this case, held on February 9 and 10 of 2009. Kenneth Clausen, who is the owner of Trident, in a fiduciary capacity, testified that he had no personal knowledge of the insurance

---

under this Rule, shall not be deemed an admission of the Association's liability. . . . [T]he liability of the Association to the Member for any loss, damage or expense shall not be affected by any acts of the Association prior to formal presentation to the Association of the Member's claim for reimbursement or indemnity.

(JX-3.) Furthermore, Rule 1, Section 13 states:

> If a Member commits any breach of any of its obligations under this Section 13, the Board of Directors may in its sole discretion reject or reduce any recovery to which such breach may appear to the Board to be relevant.

4

coverage provided by Defendant, nor did he have any knowledge of the three claims and how they were administered.[2] Norman Levitan, who worked for IMCL in positions of increasing responsibility, testified knowledgeably about the matters in this case. Paul Sa, who is the former Chairman of the American Club, testified about the meeting at which the American Club's Board of Directors considered Trident's requests for reimbursement. Finally, Charles Gornell, who is the vice president of SCB and the person responsible for rejecting each of Trident's claims for reimbursement, testified as to his work on each of the three claims and explained his reasons for SCB's actions on the claims.

In addition to these four witnesses who testified at trial, Trident and American Club submitted designated and cross-designated deposition testimony of the following witnesses: Alexander Fernandez, Halstead Hodgson, Reinhart Mairunteregger, William Milliken, David Horr, and Allan Kelley. The first three witnesses were Trident employees. The last three witnesses were the attorneys who represented Trident in the three claims at issue.

The following findings are based on the testimony and depositions just described, as well as the evidence and exhibits constituting the rest of the record.

**I.  Legal Standard**

Trident claims that American Club was obligated to cover the Taylor, Cartaya, and Rivera claims under its P&I agreement. The essential elements of its breach of contract claim are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337,

---

[2] Mr. Claussen testified that he did not know how the P&I policy with the Club was obtained (Tr. 49:16-17); he made no investigation of how IMCL was to provide insurance (Tr. 50:3-7); he never spoke with anyone from the Club or SCB (Tr. 51:13-16); he never spoke with the attorneys representing Trident's interests in the three claims at issue (Tr. 52:2-5); and he had no dealings with the three claims while they were pending (Tr. 52, 9-19).

5

348 (2d Cir. 1996). There is no dispute about the existence of a contract in this case (there is one), or about whether American Club paid the claims at issue (American Club did not) or the damages involved (the amounts claimed for reimbursement). The question is whether Trident satisfied the conditions precedent to coverage as established by the Club's Rules. This inquiry, in turn, depends on the answer to the two questions certified for trial: was the Board's procedure fair, and was the Board's substantive decision to deny coverage incorrect? In reviewing fairness of the Board's decision to deny the claims at issue, the Court assesses whether the directors' judgment and discretion was exercised "in good faith and not fraudulently or arbitrarily." *Turner v. American S.S. Owners' Mutual Protection & Indemnity Ass'n*, 16 F.2d 707, 709 (5th Cir. 1927).

## II.  The Club's Rules

The Court has already held, as a matter of law, that the insurance contract interpreted in accordance with the Club's Rules governs the relationship between the parties in this case—not the provisions of Section 3420 of New York Insurance Law. (*See* Dkt. 76, Order dated July 24, 2008 at 9.)

American Club promulgates rules for its P&I insurance. (JX-3.) These rules establish the requirements with which an insured must comply in order for the Club to reimburse the insured's claim. Rule 1, Section 13 of the Club Rules states, in pertinent part:

> In the event of any happening which may result in loss, damage or expense for which the Association may become liable, prompt notice thereof, on being known to the Member, shall be given by the Member to the Association. The Member shall take and continue to take all such steps as may be reasonable for the purpose of averting or minimizing any expense or liability in respect whereof it may be insured by the Association.

>The Member shall also disclose and produce all information, documents or reports in or coming into its or its agents' (including lawyers') possession, power or knowledge relevant to any such casualty, event or claim available at the time of notification and at any other time.
>
>The Member shall neither settle nor make any admission in respect of liabilities, costs or expenses for which it is insured without the prior written consent of the Association.
>
>If a Member commits any breach of any of its obligations under this Section 13, the Board of Directors may in its sole discretion reject or reduce any recovery to which such breach may appear to the Board to be relevant.

(JX-3.) These rules clearly give the American Club Board "sole discretion" to reject or reduce recovery for a claim if the Board feels that one of the conditions precedent to coverage have been breached: namely, if an insured (1) fails to give prompt notice of any "happening" which "may" result in liability for the Club; (2) fails to take reasonable steps to avert or minimize expenses associated with such happenings; (3) fails to produce "all information, documents, or reports" it possesses about claims; or (4) settles or makes admissions of liability without the Club Board's written consent.

Under Rule 2, Section 17, until an insured formally presents its indemnity claim, all of the Club's rights are reserved as to that claim. (*See* JX-3, Rule 2, Section 17.) The rules also provide that, should any dispute about insurance coverage arise between an insured and the Club, "such difference or dispute shall in the first instance be referred to and adjudicated by the Board of Directors." (JX-3, Rule 1, Section 15.)

### III. Fairness of the Club's Procedures

As the Court noted in its February 4, 2009 Order, the first question to be resolved is whether American Club's procedures for covering claims and reviewing claims coverage are fair. Trident has failed to show by a preponderance of the evidence that they are not. Trident claims that they never received a copy of the Club Rules. But Kenneth Claussen, who represented Trident from 1970 through the date of trial, testified candidly that Trident never asked for the Rules, and simply assumed the new relationship with the Club would be the same as past relationships with insurers. (Tr. 78:7-14.) Trident operated without a copy of the Rules from 2000 to 2004, but not because the Club refused to give them the Rules (*id.*). Instead, Trident was simply "relying on IMCL without ever having looked at the actual [contract] terms." (Tr. 78:18-22.)

This was not an unusual arrangement, according to Edward Levitan, the vice president and CFO of IMCL. Typically, concessionaires like Trident were not involved in meetings with the insurer; dealings with P&I insurance are handled by the vessel operator. (Tr. 104:17-25.) Consistent with this arrangement, Charles Gornell, Vice-President of Claims for SCB, testified that IMCL instructed him in June of 2000 that the Club should deal with IMCL, not Trident. (Tr. 275:23-276:3.) This arrangement, whereby Trident corresponded with IMCL, which in turn dealt with American Club as Trident's agent, was confirmed by the deposition testimony of Alex Fernandez and others. (*See*, *e.g.*, Fernandez Dep. 14-15, Mairunteregger Dep. 109-110.) As to whether IMCL knew of the Club's rules for claims coverage, Levitan admits that he knew that the Club would want to be informed of "all claims and expenses that became related to their risk or responsibility." (Tr. 112:3-4.) He also understood that the Club wanted to be informed "carefully and fully" in order to minimize costs involved with claims, and limit potential claim

8

exposure.  (Tr. 112:22-23.)   One of the reasons Levitan was aware of this was because representatives of the Club and SCB, including Gornell, met with IMCL in June of 2000 to discuss control of cases, submission of claims to the Club, and other requirements.  (Tr. 94:20-95:11.)  Levitan specifically recalled being told the types of documents associated with potential claims that the Club wanted to receive.  (*See id.*)  When Levitan received the rule book from the Club, he never made an effort to discuss it with Trident  (Tr. 110:6-12), since insurance and communications with the Club would be handled by IMCL.

Charles Gornell's testimony was convincing and shows that as soon as the Club anticipated that it would not cover a claim, it notified IMCL by sending a reservation of rights letter.  (*See* JX-29, 109, JX-156.)  While the witnesses called from Trident disclaimed knowledge of the letters, Levitan credibly testified that IMCL kept Trident apprised of these letters.  (*See* 138:11-13.)  It is worth noting that, regardless of when the Club gave notice of its reservation of rights to IMCL, the Club Rules make clear that, until an insured formally presents its indemnity claim, all of the Club's rights are reserved as to that claim.  (*See* JX-3, Rule 2, Section 17.)

Levitan testified that he believed it was unfair that these reservation of rights letters did not indicate to the insured what it could do to correct the situation.  (Tr. 154:14-17.)  But this was not the purpose of the letters; rather, they served a notice function of informing the insured that it would proceed at its own risk, and should act as a "prudent uninsured."   (Tr. 274:10-21, testimony of Charles Gornell.)   If the claim was not covered, the insured would have the opportunity to appeal the decision to the Board, pursuant to Rule 1, Section 15.

Trident has failed to show that a fundamental lack of procedural fairness caused the rejection of its appeals of the Club's denials of coverage.  Paul Sa, the Chairman of the Board of Directors for the Club, testified that the directors approach claims review "fairly and impartially"

9

and take the process "very seriously." (Tr. 220:8-13.) Trident's lawyer, Mr. Keough, sent a letter to the Club's Board requesting that it reconsider its position in denying coverage of the three claims at issue. (*See* JX-80.) The Board received no further submissions from Keough aside from the letter, and considered only its memoranda from Gornell and a verbal explanation from the claims managers. (Tr. 199:14-16.) None of the directors supported Trident's position. (Tr. 207:25-208:5.)

It is unclear why Keough did not submit further materials in his appeal to the Board. Keough did not testify at the bench trial in this case. Sa admitted that there are no published rules or proceedings which describe how to take an appeal with the Board (Tr. 226:15-227:1), but parties can ask the managers for information about the proceedings (Tr. 227:9). There is no evidence in this case that anyone from Trident ever asked more about the process. Furthermore, Gornell testified that when the Taylor claim was being submitted to the Board for review, Gornell "invited him at that time to give [the Board] whatever information he felt he could add" and the Board would review it. (Tr. 281:16-20.) Keough did not avail himself of the opportunity. The Board's rejection of Trident's appeals in these circumstances does not demonstrate a lack of fairness in the Club's procedures.

### IV.   The Taylor Claim

Claimant Mark Anthony Taylor alleged that he suffered an accident on the Ocean Breeze on May 22, 2000. Taylor claimed that while he was loading the ship's stores, he slipped on a wet floor, hit his back on a door frame, and dropped a box on his left knee. (JX-10.) By June 1, 2000, Taylor's lawyer, David Rash, notified IMCL of the claimed injury and demanded prompt payment of maintenance and cure, until maximum medical improvement was achieved. (*Id.*) IMCL promptly advised Trident of the Taylor claim, directed Trident to pay maintenance and

cure, and told Trident that IMCL had notified the Club.  (JX-9 and 10.)

Trident provided maintenance and cure to Taylor, as well as transportation to and from the doctors selected for him by his attorney, Mr. Rash.  Mr. Rash charted a course of doctors, prescriptions, medical imagings, and physical therapy for the claimed injury to the knee and back, as well as medical transport and payment for prescriptions.  (*See* JX-11, 12, and 13.)  By August, this regimen of medical examinations had added a claim of severe stomach pain and a possible hernia.  (JX-14.)  Mr. Rash advised IMCL on September 20, 2000 that Mr. Taylor would undergo knee surgery.   Trident and IMCL did not conduct their own medical examinations.

While notice of the claim was delivered to the Club and SCB, no further information was provided.  On September 13, 2000, Mr. Gornell of SCB wrote to IMCL saying it "heard nothing further" concerning the claim.  (JX-16.)  Trident's attorney, Raul Chacon, wrote to Trident on September 5, 2000, saying that he had "some medical reports, but no information with regard to the accident of the status of the lawsuit, if there is any."  (JX-15.)  The letter indicates that Mr. Chacon's attempts to obtain information were being bounced back and forth between Emilio Tsokopolous and Mike Mairunteregger, the operations director of Trident, and that he was not receiving the information he needed.

Mr. Chacon's lack of information about medical treatment and the lawsuit continued for nearly a year.  On June 2001, Mr. Chacon sent a letter to Gornell, saying that he had just discovered that Mr. Taylor had undergone two surgeries: one for his knee and one for his ankle. (JX-26.)  The claimed ankle injury was not mentioned in the initial medical report in May 2000. Gornell testified that these surgeries had never been reported to the Club by Trident or IMCL. (Tr. 262:11-22.)  The Club was kept out of the loop despite Gornell's request of Christine

11

MacKinnon at IMCL, as early as September 15, 2000, to keep him posted on developments. (JX-18; Tr. 254:16-22.) Gornell accordingly reserved the Club's position on the claim on June 11, 2001, less than a week after receiving Chacon's letter. (JX-29.)

When Trident's claim for reimbursement for Anthony Taylor was submitted to SCB, in the amount of $302,757.75 (JX-74), the Board reviewed it, and denied it based on activities Trident undertook back in June 2001 that were prejudicial to the Club's position. (JX-75; Tr. 268:4-14.) In the denial letter, Gornell referred to the Club's June reservation of rights letter. (JX-75.) Gornell testified that the reasons for the denial were Trident's failure to meet the preconditions for coverage: namely, failure to keep the club notified of developments and failure to provide information. (Tr. 268:15-22.) Gornell believed that whatever Taylor's attorney had requested was granted, and that, had Trident kept their own lawyer, Mr. Chacon, informed, and had the Club been properly informed, this would not have happened. (Tr. 270:15-21.) Gornell testified that had the Club been notified early on, it would have been able to determine whether Taylor's medical procedures were actually necessary, and the Club could have kept costs down. (Tr. 272:21-273:3.) Gornell gave the example that, even if Taylor's doctors recommended surgery, the Club "could have subjected him to an IME [Independent Medical Examination] and determined whether it was really necessary; [and] had another doctor look at him." (Tr. 302:1-3.)

Gornell's position is factually accurate. In September 2001, after Taylor had already undergone two surgeries, he repatriated to Costa Rica and a doctor resident there found that he needed stomach surgery, estimated at a cost of $6,000. (*See* JX-36.) As Gornell became more involved in asking questions and demanding information from Trident, and Trident's attorney began to obtain the information necessary to defend the claim, cost minimization and generally

12

better results were achieved. The cost of Taylor's stomach surgery suddenly dropped by almost half, the hernia became a muscle strain, and after further testing, it was determined that Mr. Taylor did not need surgery at all. (JX-42.)

Even absent this compelling evidence that cost savings could have been achieved early on had Trident kept its attorney and the Club informed, the Court's conclusion would remain the same: Trident did not fulfill the preconditions for claim coverage, spelled out in Club Rule 1, Section 13. Trident did not give prompt notice of the "happening[s]" surrounding the Taylor claim which could result in liability to the Club, and did not produce all relevant information, documents, or reports about the claim at the appropriate times so that cost minimization could be achieved. The Club was, therefore, well within its rights to reject coverage of the Taylor claim.

## V. The Cartaya Claim

Claimant Roberto Cartaya was employed by Trident as a cook on the Ocean Breeze in June 2000. Cartaya allegedly sustained an injury on June 29, 2000 to his testicles, groin, and back while jumping from the Ocean Breeze to a tender. Gornell testified that the Club was first made aware of the accident after being copied on a letter from David Horr, a lawyer at the firm of Horr, Linfors, Skipp & Novak, P.A., a club correspondent, to Louis Pietro of Trident on August 1, 2000. (JX-86; Tr. 286:16-19.) His testimony as to when the Club was first informed of the claim is undisputed. In the letter which provided notice to the Club, Horr notes that there had already been authorization of medical treatment for Cartaya and a guarantee of payment by Triton Cruise Services Inc. (Trident) on June 29, 2000. (JX-86.) By the time the Club received notice of the injury, Cartaya had also already undergone two CT Scans and multiple treatments.

13

Horr's letter indicates that this was news to him at the time he was writing the letter. (*Id.*) Horr explained to Trident:

> It will be necessary to monitor development of this claim closely. We can expect that Mr. Ayala [Cartaya's attorney] will seek to inject himself into the 'management' of Mr. Cartaya's care. It will be important to resist these tactics and make sure that the cost of cure for Mr. Cartaya is not inflated through Mr. Ayala's attempts at management.

(*Id.*)

Later, in June of 2001, Gornell received a letter from Trident listing the expenses incurred by Cartaya, among other crew members, for medical procedures of which he had not previously notified. (Tr. 288:8-14, 333:17-20.) Gornell testified that he and Arthur Pollack of IMCL were appalled at the amounts that were involved with the Cartaya claim. (Tr. 288:8-14.) Gornell issued a reservation of rights letter on August 1, 2001. (JX-109.) In his letter, Gornell voiced his frustration about how the claim was being handled—both by Trident's paying "considerable funds . . . none of which were with the Club's approval," and that important decisions, such as whether to authorize psychiatric evaluations, were still being handled by Trident, and not IMCL. (JX-109.) American Club also had not received many of Cartaya's medical records. (JX-109.) Levitan of IMCL testified that he understood the Club had reserved its rights on the claim because the Club had not been made aware of the maintenance and cure and because the Club's prior written consent had not been sought or obtained prior to Cartaya's medical proceedings. (Tr. 173:20-174:2.)

The Court determines that Trident's handling of the Cartaya claim—procedures for which Trident had paid even before the Club was aware of Cartaya's accident—did not meet the Club Rules' requirements for coverage.

Furthermore, there was a settlement in the case that resolved this claim. Cartaya's complaint was eventually tried to a defense verdict. (Tr. 294:5-11.) Afterward, Levitan submitted a reimbursement claim. The Club initially refused to pay and reminded him of the reservation letter. (JX-152; Tr. 176:2-12.) But based on IMCL's urging that some reimbursement should be made for the claim, the Club reconsidered its position. (JX-153, JX-154, JX-156.) In correspondence dated June 2, 2003, Gornell wrote to IMCL:

> Your reimbursement request including the supplemental billing totals $363,334.43 out of which we believe $98,231.78 would have to be disallowed due to late submittal but those expenses would go toward satisfying the deductible leaving a balance of $265,102.65 to be considered.
>
> You are aware of the views we have previously expressed on this matter and believe all will agree that had it been handled differently form [sic] the outset there would have been a saving in all areas. The legal fees and expenses would have been considerably less, as would have the medical expenses. In an effort to arrive at a fair and reasonable solution we have discussed the situation in depth with our attorneys Horr, Novak & Skipp and have thoroughly reviewed our file. As a result we are agreeable to a reimbursement of $194,856.03 in this instance.
>
> We believe that to be a just resolution to a difficult situation and are prepared to put this in line for payment upon receipt of your confirmation of same.

(JX-157.) In response to the Court's questioning, Levitan testified that he understood this correspondence to mean that the Club's payment would "extinguish" the Cartaya claim (Tr.

15

178:9-11) and be a "full settlement" of the claim. (Tr. 178:12-15.)[3] Gornell also testified that he understood the $194,856 was in full settlement of the claim for reimbursement, and that he would not have made a payment if the sum were not meant to be full and final. (Tr. 334:6-13.) Before agreeing to the settlement amount, Levitan recalls discussing the settlement with Mr. Mairunteregger of Trident. (Tr. 179:4-8.) Levitan agreed to the settlement amount (Tr. 178:21-22) and communicated the agreement to Gornell. (JX-158.) Trident accepted the money, and the credit was passed on to Trident's account. (Tr. 188:9-13.)

Based on the record and testimony, the Court finds that the sum of $194,856.03 was a full and final settlement for the expenses incurred for the Cartaya claim, for which IMCL was authorized to enter into agreement as Trident's agent. Trident is not entitled to additional reimbursement for the Cartaya claim, and the Court finds in favor of the Club.

## VI. The Rivera Claim

Claimant Jorge Rivera was employed by Trident in March 2001 as an assistant cook on the Ocean Breeze. On March 8, 2001, Rivera allegedly slipped on the galley floor and fell, injuring his lower back. (*See* JX-163.) On March 9, 2001, Rivera reported his back injury and was treated by the ship's doctor, an IMCL employee. (*Id.*) The Club was not notified of Rivera's alleged March 8, 2001 injury until over 16 months later, on or about July 22, 2002, in correspondence from Allan Kelley of Fowler White Burnett P.A., a Club correspondent who was retained by IMCL. (*Id.*; Tr. 302:10-17.) Kelley's letter describes that Rivera had been "involved in a slip/trip and fall accident" and "was treated for low back pain." (JX-163.) Rivera retained counsel in connection with a complaint about his right heel allegedly resulting from the same

---

[3] Levitan later qualified that if there were further bills and legal fees after the $300,000, he thought IMCL could still submit those. (Tr. 180:3-14.) However, Levitan admitted that this understanding was never expressly communicated to Gornell. (Tr. 181:2-8.)

16

accident, which Allan Kelley's letter says Rivera first complained of in October 2001. (*Id.*) Rivera was later transferred to another Trident vessel on March 11, 2002.

Upon review of Rivera's medical file, Fowler White discovered that Rivera had a "prolonged history of physical complaints" including surgery after another slip and fall, and prior reports of back pain. (*Id.*) Based on Rivera's medical history, IMCL questioned Trident's decision to employ Rivera, and asked Trident to hold it harmless for any potential claim in the matter. (*Id.*) In seeming acknowledgement of their transgression, Trident offered to pay IMCL $25,000 toward resolution of the matter for the problems created by hiring Rivera. (JX-169.)

In July 2002, Rivera filed suit in Florida, claiming Jones Act Negligence, Failure to Provide Prompt and Adequate Treatment, and Failure to Provide Maintenance and Cure, which prompted IMCL to retain Fowler White. (JX-165.) In correspondence with the Club, Kelley explained that he was unclear on what the basis for Rivera's maintenance and cure claim was. (JX-164.) Kelley also notified the Club that two foot specialists had recommended that Rivera receive foot surgery. (*Id.*)

The Club reserved its rights on reimbursement of the claim in a letter to IMCL dated March 4, 2003. (JX-176.) The Club's stated reasons for reserving its rights were that Trident was tardy in bringing the matter to IMCL's attention and was negligent in hiring a seaman with such a long history of physical complaints. (*Id.*)

About a month after the Club reserved its rights, Kelley notified the Club that Rivera was now claiming he required back surgery. (JX-178.) Prior to the claim for back surgery, Fowler White had advised SCB that it should hold a $25,000 reserve for the claim. (Pl. Rule 56.1 Stmt. 82; JX-179.) After receiving news of the allegations of back injury, Kelley's anticipated reserve

17

of the case swelled to $200,000.  (JX-180.)  Eventually, after receiving written approval from the Club (JX-184), the Rivera case was settled for $150,000 (JX-187).

Gornell testified that Rivera's back injury was never reported to the Club at the time that it occurred in March 2001.  (Tr. 239:3-240:4.)  Trident claims that it was under no obligation to report the injury, because the rules do not require trivial injuries to be reported to the club.  But Gornell testified that Rivera's back injury should have been reported because it is "potentially serious."  (Tr. 336:8.)  Gornell credibly testified that if someone claims a back injury, the Club typically conducts a background check.  (Tr. 336:14-25.)  The Club would examine the medical records more closely, and have an investigator take a statement.  (*Id.*)  This would also have allowed the Club to see the claimant's prior history of physical complaints.  (Tr. 239:3-240:4.)  The claim related to Rivera's back injury later increased the settlement amount for the claim to multiple times the original claim.  The Court finds that Trident's failure to report Rivera's back injury to the Club in 2000 prejudiced the Club's position.  Trident's notice of the injury failed to comply with Rule 1, Section 13's requirements to give prompt notice of "any happening" which "may" result in liability for the Club, nor did it comply with the requirement of producing all relevant information about the accident.

While the question of whether Trident complied with the Club's Rules as to Rivera's foot-related claims is a closer call, the Court finds that the Club's denial of reimbursement for this claim, too, was neither unfair nor improper.[4]  The record reflects that Rivera complained about his foot as early as October 2001.  The Club was not informed of this at the time, and did not receive notice until July of 2002.  Had the back injury been reported when it should have, the Club could have conducted an investigation of Rivera, discovered his prolonged history of

---

[4] The Club had offered to settle Rivera's foot-related claim for $65,000 on October 20, 2003 (JX-198), but the Club was under no obligation to do so.

18

physical complaints, and taken actions that may have nipped the foot injury claim in the bud, or otherwise mitigated costs associated with the claim. Given Trident's noncompliance with the Club Rules, and Rule 1, Section 13 provision which gives the Club Board sole discretion to reject any recovery to which a breach of the rules "may appear to the Board to be relevant," the Court finds the Board was within its rights to reject coverage of the Rivera claim in its entirety.

## CONCLUSION

The Court finds that Trident failed to meet its burden of showing by a preponderance of the evidence that it lacked fair notice and an opportunity to present evidence to the Board, or that the Board's substantive decisions to deny coverage for the Taylor, Cartaya, and Rivera claims were improper. Accordingly, Trident's breach of contract claim fails. The Clerk of Court is directed to enter judgment for the Defendant and close this case.

Dated: New York, New York
      September 19, 2014

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge